UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAWASAKI JUKOGYO KABUSHIKI KAISHA,<br><br>Plaintiff,<br><br>v.<br><br>RORZE CORPORATION, et al.,<br><br>Defendants. | Case No. 22-cv-04947-PCP<br><br>**ORDER GRANTING MOTION TO DISMISS, DENYING MOTION TO STRIKE, AND GRANTING REQUEST FOR JUDICIAL NOTICE**<br><br>Re: Dkt. Nos. 112, 113 |

In this patent case involving chipmaking robots, plaintiff Kawasaki Jukogyo Kabushiki Kaisha (Kawasaki Heavy Industries) challenges counterclaims and affirmative defenses asserted by plaintiff Rorze Corp. For the reasons set forth below, Kawasaki's motion to dismiss Rorze's counterclaims is granted but its motion to strike Rorze's affirmative defense is denied.

**I.    Background**

Semiconductor chips are created from thin wafers of crystalline silicon. The wafers need to be kept clean and free from interference during the chipmaking process. To accomplish this, wafers are transported in specialized pods as they move between the different pieces of equipment used throughout the process. These are called front opening unified pods, or FOUPs.

At each processing station, a wafer transport pod docks to the station (a piece of enclosed manufacturing equipment called an equipment front end module or EFEM). Once the pod attaches, the wafers can be taken out of the pod and brought inside the processing station, where some step in the manufacturing process is then carried out. The sealed interior is kept clean using air filters and the like.

The patents at issue in this case all relate to the robots that carry silicon wafers inside of these enclosed stations. Once a transport pod docks, these robots can remove the wafers, carry

1  them through the enclosed space to another part of the station for processing, and carry the wafer
2  back to the pod once the manufacturing step is done so it can move to the next station.
3      The robots addressed by the patents in this case have movable arms that pivot around a
4  single fixed axis. Having a single pivot axis instead of another kind of mechanism (like one that
5  slides throughout the enclosed processing space) reduces the amount of movement. This helps
6  keep the wafers clean by minimizing the amount of dust that is scattered. These patents aim to
7  increase the length of the robot's arm while also making sure that the robot does not collide with
8  other parts of the equipment. One component that poses a particular collision risk is called a
9  FOUP opener. When a wafer transport pod docks to the processing station, this is the component
10 that opens the corresponding doors of the pod and station, allowing the inside of the pod to be
11 accessed from inside the processing station. The FOUP opener moves inside the interior of the
12 processing station. Because both the FOUP opener and the robot arm can move within this shared
13 space, there is a greater risk that the robot arm could accidentally hit the FOUP opener as opposed
14 to something stationery, like the wall of the processing station. The patents aim to limit collisions
15 by setting the maximum length of the robot arm such that, at least when the robot arm is in its
16 collapsed state, the robot arm is not long enough to hit the FOUP opener, even while it is moving.

17                                    *     *     *

18     The following facts from the countercomplaint are taken as true in resolving this motion.
19     Yasuhiko Hashimoto is a research and development engineer and longtime executive at
20 Kawasaki. He is currently Kawasaki's president. In July 2007, he applied as sole inventor for a
21 U.S. patent based on an earlier July 2006 application for a patent in Japan. Kenji Noguchi, a
22 Kawasaki patent engineer, helped with the application. Mr. Hashimoto and Mr. Noguchi made
23 prosecution decisions for this application and directed Kawasaki's patent prosecution counsel.
24 This application ultimately became the '782 U.S. patent, which was assigned to Kawasaki and is
25 the parent patent for all of the reissue patents asserted in this case.
26     The initial version of claim 1 in this patent application involved a "wafer transfer
27 apparatus" that would transfer a wafer carried in a transport pod within an enclosed processing
28 station. The claim explains how this enclosed station has front and rear walls "arranged at a

1  predetermined interval," each with an opening for access. The front wall has a FOUP opener that
2  can open and close the transport pod when it docks to the processing station. The "wafer carrying
3  robot" is located inside the interior of the processing station (the "interface space") and is set up to
4  move wafers between the front and rear openings. The robot itself is fixed to the floor and rotates
5  around a predetermined pivot axis. The robot arm is made up of several rotating "link members"
6  which ultimately connect to a "robot hand" that can hold wafers. Like a human arm, these link
7  members can either extend to increase reach or fold in on themselves to take up less space. Claim
8  1 then specifically explains how the dimensions of this robot arm should be set:

> [I]n a minimum transformed state where the robot arm is transformed such that a distance defined from the pivot axis to an arm portion which is farthest in a radial direction relative to the pivot axis is minimum, a minimum rotation radius R, as the distance defined from the pivot axis to the arm portion which is the farthest in the radial direction relative to the pivot axis, is set to exceed 1/2 of a length B in the forward and backward directions of the interface space, the length B corresponding to a length between the front wall and the rear wall of the interface space forming portion, and is further set to be equal to or less than a subtracted value (B – L0) to be obtained by subtracting a distance L0 in the forward and backward directions from the rear wall of the interface space forming portion to the pivot axis, from the length B in the forward and backward directions of the interface space (i.e., $B/2 < R \leq B - L0$).

18  In other words, when the robot arm is folded in on itself into its smallest possible state, the
19  maximum length between the arm's pivot axis and its furthest point is R. The distance between the
20  pivot axis and the back wall is L0. And the front-back depth of the inside of the processing station
21  is B. According to this claim, R must be greater than half of B, but also less than the distance
22  between the pivot axis and the front wall (which is B – L0). (If R was longer than that, the arm
23  would not be able to rotate without hitting the front wall, even when collapsed).  Claims 2–7
24  depended on claim 1, and claim 8 paralleled claim 1 but for a "substrate transfer apparatus" rather
25  than a "wafer transfer apparatus."
26      In April 2010, the U.S. patent office provisionally rejected claims 1–8 of this application.
27  The office concluded that the claims were unpatentable over three earlier patents and other
28  disclosures by Mr. Hashimoto. These three prior patents included a Japanese patent issued to

Imahashi Kazunari (Pub. No. 2003-179120), another Japanese patent issued to Tokunaga Kenji (Pub. No. 2003-45933), and a U.S. patent issued to Satish Sundar (Pub. No. 2005/158153, Patent No. 7,226,269). According to the patent examiner, the Kazunari patent already taught "a wafer transport with an interface space, FOUP opener, [and] wafer carrying robot with arm links and drives." The Kenji patent showed these same items, as well as "more detail of a FOUP opener." And the Sundar patent showed these same items with "4 FOUPs and the dimensional and length requirements." The examiner believed that the Kazunari patent already taught all of the claimed limitations and relative dimensions set out in Mr. Hashimoto's application. The examiner also noted that "over the prior art … the only differences are dimensional optimization from routine experimentation for a desired configuration of known items." This rendered the application's claims "unpatentable" and "obvious" because a skilled artisan would know to try modifying the inventions shown in these prior patents or could have achieved Mr. Hashimoto's goal of optimizing the device through "routine experimentation" regarding its layout and dimensions.

In August 2010, after the rejection, the examiner met with Mr. Noguchi and one of Mr. Hashimoto's attorneys. They discussed the prior art and rejections and presented a proposed amendment. After the meeting, Mr. Hashimoto submitted an amendment to his application. The amended version of claim 1 added the following language regarding the radius R of the robot arm:

> R is set to be equal to or less than an allowable length $(B - L0 - E)$ to be obtained by subtracting the distance $L0$ … from the rear wall … to the pivot axis and a length E of a robot invasion restricted region, which is set for the FOUP opener and is measured from the front wall…, from the length B … (i.e., $R < B - L0 - E$).

The key addition here was the length E, defining a "robot invasion restricted region." With this addition, the collapsed robot arm would not only be kept short enough to avoid colliding with the wall itself, but also short enough that (at least when collapsed) it could not come within the distance E from the wall. And this distance, as the amended language explains, is set for the FOUP opener (which is located at the front wall).

Mr. Hashimoto submitted remarks along with this proposed amendment. After specifically discussing the prior rejection of Mr. Hashimoto's application as unpatentable over the Kazunari,

4

Kenji, and Sundar patents, the remarks argued that "the applied references fail to disclose or render obvious … a wafer transfer apparatus" featuring a robot arm with a radius determined based on a robot invasion restricted region as set out in the amended version of claim 1. The remarks then state that "[i]n view of the pitfalls and teachings of the applied art, it is clear that there is no contemplation of a specifically defined robot invasion restricted region," and that "[a]s such, there can be no teachings within the applied art that render obvious the calculation of a minimum rotation radius as claimed as a function of the robot invasion restricted region."

Shortly thereafter, in October 2010, the examiner responded to Mr. Hashimoto's proposed amendment with a notice of allowability stating that claims 1 and 3–15 as amended would be allowed. The examiner stated that "[t]he prior art taken as a whole does not show nor suggest all of the claimed limitations." He noted that the Kazunari patent was the "closest prior art" but that even that patent "does not include all of the claimed limitations."

The '782 patent based on Mr. Hashimoto's application was issued in January 2011. All of the patents asserted in this case are reissues of the '782 patent. They include U.S. Reissue Patent Nos. RE45,772; RE46,465; RE47,145; RE47,909; and RE48,031. The reissue applications were filed between 2013 and 2018, and the reissue patents were issued between 2015 and 2020.

\* \* \*

Kawasaki filed this infringement action against Rorze in August 2022. Kawasaki filed an amended complaint in September 2023, and Rorze filed an answer and counterclaims the next month, which it subsequently amended. Kawasaki then filed the present motion to dismiss and strike portions of the counterclaims and affirmative defenses.

**II.     Legal Standards**

    **A.     Judicial Notice**

Generally, "courts may not consider material outside the pleadings when assessing the sufficiency of a complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). But Federal Rule of Evidence 201 permits judicial notice of "a fact that is not subject to reasonable dispute" because the fact is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A court may take

5

notice of "undisputed matters of public record" but not of "disputed facts stated in public records." *Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001).

### B.     Motion To Dismiss

A complaint that does not state a plausible claim upon which relief can be granted can be dismissed under Federal Rule of Civil Procedure 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions "must be supported by factual allegations." *Id.* at 679. The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

### C.     Motion To Strike

Rule 12(f) allows (but does not require) the Court to "strike from a pleading an insufficient defense." "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979). Unlike counterclaims, affirmative defenses are not subject to the heightened pleading requirements set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Iqbal*. *See Kanaan v. Yaqub*, ⎯⎯ F.Supp.3d ⎯⎯, 2023 WL 8892982, at *2 (N.D. Cal. 2023).

## III.    Requests for Judicial Notice

Kawasaki requests judicial notice of several documents in public Patent and Trademark Office files. This request, which Rorze does not oppose, is granted. The Court takes notice of the existence and contents of these documents but draws no further inferences or characterizations.

## IV.    Motion to Dismiss

Rorze asserts six counterclaims: (I) inequitable conduct, (II) violation of the federal Sherman Act, (III) violation of California's Unfair Competition Law, (IV) prosecution laches, (V) noninfringement, and (VI) invalidity. The antitrust and unfair competition claims are derivative of the inequitable conduct claim. All of the other claims seek a declaratory judgment. Kawasaki seeks dismissal of the inequitable conduct, antitrust, unfair competition, and prosecution laches

claims in their entirety. It also seeks partial dismissal of the invalidity claim. For the reasons that follow, Kawasaki's motion is granted.

### A. Inequitable Conduct (Count I)

Rorze's first counterclaim seeks a declaratory judgment that Kawasaki has engaged in inequitable misconduct. "Inequitable conduct is an equitable defense to patent infringement." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). "To successfully prove inequitable conduct, the accused infringer must present evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the PTO." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (cleaned up). "[I]n pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009). But Rule 9(b) allows both "knowledge of the withheld material information or of the falsity of the material misrepresentation" and "specific intent to deceive the PTO" to be "averred generally." *Id.*

#### 1. Misrepresentation and Failure to Disclose

Rorze alleges several misrepresentations or failures to disclose to support its inequitable conduct claim. These are addressed in turn.

First, Rorze alleges that Mr. Hashimoto and Mr. Noguchi misrepresented the novelty of the "robot invasion restricted region" claimed in the '782 patent. As discussed above, the patent office at first rejected several of the claims in the application that led to the '782 patent as unpatentable over three specific prior patents. Mr. Hashimoto amended his claims in response. The accompanying remarks submitted by his attorneys stated that, "[i]n view of the pitfalls and teachings of the applied art, it is clear that there is no contemplation of a specifically defined robot invasion restricted region." Rorze argues that this statement by Mr. Hashimoto's attorneys was intended to mislead the patent examiner into believing that there was no "robot invasion restricted region" disclosed anywhere in *any* prior art.

7

1    In context, though, it is clear that the reference to "applied art" is to the three specific
2 patents that the examiner had earlier relied on in rejecting Mr. Hashimoto's claims. Correct or not,
3 the assertion that those prior patents did not contemplate a specifically defined robot invasion
4 restricted region is attorney argument that cannot constitute an affirmative misrepresentation of
5 material fact. In cases like this, "an applicant is free to advocate its interpretation of its claims and
6 the teachings of prior art." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir.
7 2008). The patent examiner, in turn, can then examine the cited art and is "free to accept or reject
8 the patentee's arguments distinguishing its invention from the prior art." *Id.* Clearly, the patent
9 examiner reviewing Mr. Hashimoto's application was not only aware of these three prior patents
10 but had specifically considered what teachings they rendered obvious or might lead a skilled
11 artisan to discover through modification or routine experimentation. Accordingly, the
12 representations and argument about specific prior patents that Rorze points to cannot serve as the
13 basis for an inequitable conduct claim.

14    Second, Rorze alleges that Mr. Hashimoto and Mr. Noguchi knowingly failed to disclose
15 additional prior art that contemplated a robot invasion restricted region, including an industry
16 standard called SEMI E63. SEMI E63 was published in 1997 by the industry association
17 Semiconductor Equipment and Materials International (SEMI). The standard "specifies the tool
18 side of the mechanical interface between the main part of a process … tool and the component that
19 opens boxes and presents the boxes to the tool wafer handler for unloading and loading …
20 wafers." The standard includes a requirement for "reserved spaces." These are defined as follows:

> Inside the tool … are volumes reserved for the box opener/loader into which tool and its wafer handler may not protrude. A permanent reserved space is bounded by [dimensions]. When the door is closed, there is an additional temporary reserved space bounded by [dimensions]. When the door is being opened or closed by the box opener/loader, there is a further temporary reserved space bounded by [dimensions]. When the door is fully open, it will be withdrawn into the permanent reserved space, and the tool wafer handler may extend into the box to extract or insert wafers.

Rorze argues that this "reserved space" is the same as the "robot invasion restricted region" set forth in the amended version of claim 1.

Kawasaki argues that the E63 standard cannot be material because it is cumulative of other prior art that the examiner considered. As Kawasaki notes, Rorze alleges that the Kenji patent, as well as the admitted prior art set out in figures 13–15 of Mr. Hashimoto's application, "all disclose the 'robot invasion restricted region' and the second inequality ($R \leq B - L0 - E$) was satisfied." Kawasaki argues that, because Rorze argues that previous patents specifically considered by the examiner already disclosed the concept of a robot invasion restricted region, the E63 standard could not have been material to the examiner's decision even if it did in fact disclose the same concept.

The Court agrees. Given Rorze's allegations about the Kenji patent's disclosure of the robot invasion restricted region and its limited descriptions of that patent, it is unclear how the E63 standard's purported disclosure of the concept of a robot invasion restricted region differs, if at all, from the purported disclosure in the Kenji patent.

In any event, the fact that the proposed specification of the patent specifically refers to the E63 standard by name undermines any allegation that Mr. Hashimoto and Mr. Noguchi specifically intended to conceal the materiality of the E63 standard from the examiner. The '782 patent's specification states that in the preferred embodiment of the invention the "semiconductor processing equipment is prescribed … in the SEMI (Semiconductor Equipment and Materials International) standard." It notes that the FOUP openers in the preferred embodiment follow the specifications of the E63 standard in particular, among others.

Rorze also alleges that Mr. Hashimoto failed to disclose other patents that purportedly included the concept of a robot invasion restricted region. In particular, the countercomplaint outlines how Mr. Hashimoto was also prosecuting two other patents at the same time as the one at issue here. Rorze alleges that many of the prior art references disclosed to the examiner during the course of these two parallel prosecutions also included a robot invasion restricted region. Even if these references did in fact disclose a robot invasion restricted region, however, Rorze's allegations do not make clear how they did so any differently from the references the examiner

9

explicitly did consider—references which Rorze also alleges disclose a robot invasion restricted region. As with the E63 allegations, the allegations regarding these prior art references included in Mr. Hashimoto's parallel applications do not establish how any of these alleged failures to disclose would have been material to the examiner's decision.

For these reasons, Rorze has not pleaded a defense of inequitable conduct with the particularity required under Rule 9(b) based on any of the alleged misrepresentations or failures to disclose that are identified in the countercomplaint. The inequitable conduct claim based on misrepresentation or failure to disclose is therefore dismissed.

### 2. False Inventorship

As an alternative grounds for its inequitable conduct defense, Rorze alleges that Mr. Hashimoto's claim that he invented the robot invasion restricted region was false or deceptive because he did not invent all of the asserted claims. Instead, Rorze alleges that the concept of a robot invasion restricted region was suggested to Mr. Hashimoto by customers of Kawasaki.

Under the statute applicable at the time of Mr. Hashimoto's application, an applicant is not entitled to a patent if he or she "did not … invent the subject matter sought to be patented." 35 U.S.C. § 102(f) (2006). Challenging a patent on this basis requires showing "that there was a prior conception of the claimed subject matter and communication of the conception to the named inventor." *Cumberland Pharm. Inc. v. Mylan Institutional LLC*, 846 F.3d 1213, 1218 (Fed. Cir. 2017). "Conception is keyed to the *claimed* invention: A conception must encompass all limitations of the claimed invention." *Id.* at 1218. It is not enough to show "conception and communication of an idea *different* from the claimed invention even where that idea would make the claimed idea obvious." *Id.* at 1219 (emphasis added).

Here, Rorze's allegations do not clearly identify a complete prior conception of all claims in Mr. Hashimoto's application, nor how this complete conception was communicated to him. Rorze states that communications between Kawasaki and one of its customers "strongly suggest" that the idea of a "FOUP exclusion zone" was suggested by the customer. But Rorze does not identify any alleged prior conception that included *all* of the limitations of Mr. Hashimoto's claimed invention. It is not enough that there may have been some overlap or that an earlier idea

10

communicated to Mr. Hashimoto would have rendered the claims he made obvious. Because the false inventorship claim does not clearly allege with particularity that there was a prior conception encompassing all limitations of Mr. Hashimoto's claimed invention, the inequitable conduct claim based on false inventorship is also dismissed.

### B.  Antitrust (Count II) and Unfair Competition (Count III)

Rorze recognizes that both its Sherman Act claim under *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), and its California Unfair Competition Law claim are entirely based on its inequitable conduct claim. Because that claim is dismissed, these two claims are dismissed as well.

### C.  Patent Prosecution Laches (Count IV)

Rorze's next counterclaim seeks a declaratory judgment of patent prosecution laches. This is an equitable defense to infringement that "may render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution that constitutes an egregious misuse of the statutory patent system under the totality of the circumstances." *Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010).

The asserted patents in this case are all reissues of the '782 patent issued in 2011. The reissue patents were issued in 2015, 2017, 2018, and 2020. Rorze alleges that "Kawasaki's serial filing of reissue applications reveals a pattern of repeated and unreasonable delay," a delay that was "calculated and intentional." Rorze asserts that "Kawasaki intentionally strung out its serial prosecution of reissue patents in such a manner as to attempt to prosecute patent claims that read upon the activities of Kawasaki's competitors."

At this stage, Rorze has not pleaded facts that plausibly suggest that any prosecution delay by Kawasaki was unreasonable, let alone an egregious misuse of the patent system. Indeed, Rorze appears to take issue with Kawasaki's approach to its reissue applications primarily on the basis of those applications' substance (which, according to Rorze, impermissibly expanded the scope of the claims to cover Rorze products) rather than on the basis of any *delay* in prosecuting them. Because a laches defense is principally about delay, Rorze's allegations do not identify how any

delays by Kawasaki in prosecuting its reissue applications, as opposed to any issues with the substance of those applications, constituted an unreasonable misuse of the system.

The claim for a declaratory judgment on prosecution laches is therefore dismissed.

### D. Invalidity (Count VI)

Finally, Rorze seeks a declaratory judgment that Kawasaki's patents are invalid under the pertinent statutes and regulations, including 35 U.S.C. §§ 101, 102, 103, 112, 184, 185, and 251. Kawasaki seeks to dismiss this counterclaim to the extent it is based on false inventorship or improper reissue.

With respect to false inventorship, the parties do not raise any arguments other than the ones addressed in the inequitable conduct counterclaim. The invalidity counterclaim based on false inventorship is therefore dismissed for the same reasons.

Kawasaki also seeks to dismiss Rorze's invalidity counterclaim to the extent it is based on improper reissue under 35 U.S.C. § 251. Rorze's specific allegations regarding improper reissue appear only in its affirmative defenses, and the actual counterclaim simply cites to Section 251. In any event, Rorze appears to argue, based primarily on Kawasaki's claim construction arguments in this case, that Kawasaki used the reissue process to add new matter or broaden its claims improperly. For example, Rorze argues that Kawasaki's proposed construction of the term "robot invasion restricted region" would constitute new matter and would impermissibly expand the scope of the claims beyond the original '782 patent.

In the time since Rorze filed its counterclaim and the parties briefed Kawasaki's motion to dismiss, the Court issued its claims construction order. Dkt. No. 141, 2024 WL 1855029 (Apr. 29, 2024). The Court construed "robot invasion restricted region" and other shared terms as having the same meaning across all of the asserted reissue patents. Because Rorze's pre-claims construction arguments are largely based on a potential *change* in the meaning of this and other terms across the various patents, the improper reissue invalidity counterclaim is dismissed.

**V.     Motion To Strike**

Kawasaki moves to strike the affirmative defenses that correspond to Rorze's counterclaims, including the defenses based on inequitable conduct and prosecution laches, arguing that the normal Rule 8(a) pleading standard set forth in *Twombly* and *Iqbal* applies to affirmative defenses. This Court, however, has rejected this view and concluded that "the standard for pleading affirmative defenses … is less stringent than the standard for pleading counterclaims." *Threshold Enterprises Ltd. v. Lifeforce Digital Inc.,* ––– F. Supp. 3d –––, 2024 WL 1643697, at *4 (N.D. Cal. 2024); *see also Kanaan*, 2023 WL 8892982, at *2 (discussing district court split on this question and citing "textual and pragmatic reasons" not to apply the heightened standard to affirmative defenses).

Even though "the plausibility standard does not apply to … affirmative defenses, the Court can still consider, on a motion to strike, whether the facts that have been pleaded in support of an affirmative defense state a valid defense" and whether the defendant's allegations have "pleaded itself out" of a defense. *Threshold*, 2024 WL 1643697, at *3 n.2, *4. Although Rorze's factual allegations are insufficient to state plausible claims for a declaratory judgment that the inequitable conduct and prosecution laches affirmative defenses will apply to Kawasaki's claims against Rorze under the *Twombly/Iqbal* pleading standard, Rorze has not pleaded itself out of later raising these defenses. *Cf. Threshold*, 2024 WL 1643697, at *4. While the declaratory judgment claims are dismissed for the reasons set forth above, Kawasaki's motion to strike the corresponding affirmative defenses is denied.

Kawasaki also seeks to strike several other affirmative defenses that it argues are conclusory. But while Rule 8(a) requires that claims for relief include "a short and plain statement … showing that the pleader is entitled to relief," Rule 8(c) requires only that a response pleading "affirmatively state any avoidance or affirmative defense." "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense." *Wyshak*, 607 F.2d at 827. Here, Kawasaki argues that Rorze's affirmative defenses do not meet the *Twombly/Iqbal* Rule 8(a) standard but does not argue that any of the defenses fail to provide notice. Its motion to strike the other affirmative defenses is therefore also denied.

13

## VI. Conclusion

For the reasons set forth above, Kawasaki's request for judicial notice is granted. Kawasaki's motion to dismiss Rorze's counterclaims is also granted. The counterclaims seeking declaratory judgments with respect to inequitable conduct and prosecution laches are dismissed, as are the related counterclaims for violations of the Sherman Act and California's Unfair Competition Law. The invalidity declaratory judgment counterclaim is dismissed to the extent it is based on a false inventorship or improper reissue theory. Kawasaki's motion to strike the affirmative defenses is denied.

The Court is generally inclined to grant leave to amend when dismissing claims. Here, though, most of Rorze's dismissed claims seek declaratory judgments on affirmative defenses that will not be stricken at this time. Because Rorze will have a full opportunity to litigate these defenses at a later stage (with a fuller factual record), the dismissal of Rorze's counterclaims is without leave to amend. If Rorze believes that it can at this time plead additional facts or replead its improper reissue claim to reflect the Court's recent construction of the patents' terms, and that doing so now would alter the conclusions in this order and more efficiently resolve the parties' disputes, Rorze may seek a stipulation allowing amendment or file a motion for leave to amend.

**IT IS SO ORDERED.**

Dated: June 14, 2024

P. Casey Pitts
United States District Judge